EDWARD J. HUDSON, PETITIONER, ET AL.,* *v.*COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 16380, 16381, 16382, 16383, 16384, 16385, 17314.

Promulgated December 20, 1948.

---

*Proceedings of the following petitioners are consolidated herewith : Hudson Engineering Corporation; John B. Baird ; Mildred Bennett Baird ; Mary B. Downes ; J. R. Downes ; and Maracaibo Oil Exploration Corporation.

*Walter E. Barton, Esq.*, for the petitioners.
*E. G. Sievers, Esq.*, for the respondent.

1fort1045ts

OPINION.

Murdock, *Judge*: The theory was expressed in some of the notices of deficiency that the income derived by the petitioners was "from a manufacturing and processing operation and not from the severance and sale of a natural resource." The evidence shows that the income was from the severance and sale of a natural resource without the intervention of any manufacturing operations.

The respondent argues that all of the agreements entered into on August 1, 1941, must be considered together, and they show that Hud-

son did not acquire any economic interest in the minerals in place in the ground, but received only the right to the heavier hydrocarbons for the purpose of removing them from the other gas and to receive one-half of the gross proceeds from their sale in consideration for constructing and operating the recycling plant. He concedes that the assignments refer to the gas in place, but contends that the words "in place" are not used elsewhere and, since Hudson was described in, the processing contract as buyer, he was not an economic owner of the gas in place. He argues that the owners of the leases did not part with any economic interests, for they continued to pay the royalty owners in accordance with the original leases, they retained control over the drilling of wells, and the assignments were to terminate with the termination of the processing contract. He also argues that the economic interest in the minerals which would be subject to depletion could not be divided so that Hudson would have a depletable interest in the heavier hydrocarbons, but none in the lighter ones. These and other arguments advanced by him have been carefully considered, but the conclusion has been reached that Hudson and his assigns did have economic interests in the heavier hydrocarbons in place, which interests are subject to depletion under the applicable provisions of the code and Regulations 111, section 29.23 (m)–1.

The assignments clearly and definitely give to Hudson a one-half interest in the heavier hydrocarbons in place. Cf. *Willis R. Dearing*, 36 B. T. A. 843; affd., 102 Fed. (2d) 91. He and his assigns retained that interest throughout the period here in controversy. Those assignments were fully recognized by all of the parties to the agreements of August 1, 1941, and in subsequent agreements. There is nothing inconsistent with the assignments in the other agreements. The interests were given to Hudson in order to induce him to enter into the processing contract and it was to those interests that he had to look for his profit from the whole transaction. It is immaterial that they were subject to some condition or conditions subsequent under which they might be terminated. The respondent has not cited any cases involving assignments such as those shown herein. The parties have stipulated the amount of the depletion allowable if those taxpayers had depletable interests.

The second issue is whether the Commissioner erred in adding $50,000 to the income of Engineering for its fiscal year ended July 31, 1944. Engineering reported its income for that year upon a completed contract basis. It had a contract to build the plant for Distillate. Its fee under that contract was $120,000. The contract was completed in October 1943, which was within the fiscal year ended July 31, 1944. Those circumstances would normally require the accrual for that year of the entire fee of $120,000. *Fort Pitt Bridge Works*, 24 B. T. A. 626, 641; affirmed on this issue, 92 Fed. (2d) 825.

The petitioner, to avoid accrual of the fee, would have to prove that as early as the end of that year some contingency or reasonable uncertainty about the ultimate payment was known to exist which would justify the petitioner's failure to accrue and report this item. *National Contracting Co.*, 37 B. T. A. 689, 701, *et seq.*; affd., 105 Fed. (2d) 488.

The respondent has included only $50,000 of the total in income for that year, thus indicating that he thought there was sufficient uncertainty as to payment to excuse the petitioner from accruing the balance. It was incumbent upon the petitioner to show that there was similar uncertainty as to the $50,000. That it has failed to do. There is evidence to show that in the taxable year the payment of this fee was subordinate to a number of other obligations of the debtor, but the evidence does not show that the prospects of payment at that time were so uncertain that no part of the fee should have been accrued. There is considerable evidence to show that at a much later date there was great uncertainty, but the uncertainty must have been apparent not later than the end of the taxable year in question. The petitioner in his reply brief, discussing this very question, states that at the beginning of the operations in the latter part of 1943 it was "too early to foretell what the income of either Distillate or Hudson Engineering would be." The evidence is not inconsistent with that statement. Obviously, evidence merely showing that the income of the debtor could not be foretold is not sufficient to excuse a creditor using a completed contract method of reporting income from reporting a fee in a situation like this one. There is no evidence to show whether or not, or the extent to which, the future losses of Distillate were foreseen or forseeable. The petitioner must lose on this point because the evidence does not support its contention.

The third issue is whether Hudson had income of $96,000 from receipt of notes in that amount for the assignment of fractional portions of his interest in the heavier hydrocarbons in place which interests had no basis to him. Section 111 (b) provides that "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Hudson received no money; therefore, the question is: Had the notes any fair market value and, if so, what was it?

These notes were nonnegotiable and were subject to many complicated agreements and conditions. They were not unqualifiedly payable in money. Their ultimate payment depended upon the life of the North Houston Field and the success with which the operations in that field could be carried on. This is a situation similar to the one dealt with in *Mainard E. Crosby*, 14 B. T. A. 980, in which we

held that certain nonnegotiable notes were not the equivalent of cash and that the income of the petitioner on a cash basis would be reflected more accurately by reporting the payments on the notes as income in the year of receipt rather than including the face amount of the notes in income in the year in which the notes were given. It is held that the Commissioner erred in taxing Hudson with income of $96,000 based upon the receipt of these notes in 1944.

*Decision will be entered under Rule 50.*