The DENVER & RIO GRANDE WEST-ERN RAILROAD COMPANY, a Corporation

v.

The UNITED STATES.

No. 425–57.

United States Court of Claims.

June 7, 1963.

---

Stanley Worth and Jules G. Korner, III, Washington, D. C., for the plaintiff. Korner, Doyle, Worth & Crampton, Washington, D. C., were on the briefs.

Thomas A. Troyer, Denver, Colo., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for the defendant. Lyle M. Turner and John F. Palmer, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

Plaintiff is one of a large number of railroads which banded together in the late 1940's to buy the Pullman sleeping car business. As a result of a Government antitrust suit, Pullman, Inc., the parent company of the Pullman interests, was required in 1944 to divest itself of either its car manufacturing business or its sleeping car activities. It chose to retain the former and therefore approached various railroads to purchase the assets or stock of The Pullman Company, the subsidiary which operated the sleeping car business. The interested roads formed the Railroad Buying Group which worked out the arrangements for the transfer of The Pullman Company and the assets of the sleeping car business. The Company's stock was purchased for over $40,000,000, with the shares distributed pro rata among the buying roads. It was also agreed that the Company, once it was in railroad hands, would issue to the owning roads so-called "car notes" (the subject of this suit).

Plaintiff, which is on the accrual basis, received its "car note" in August 1947. The note was not assignable or transferable. The Pullman Company agreed to pay on June 30, 1948, the sum of $98,863, with interest at 3% from July 1, 1947. The principal sum was to be paid either in heavyweight sleeping cars (at a fixed value) or in cash out of a separate fund to be accumulated by the debtor. The cars could be obtained immediately or at any time up to December 31, 1948; if the railroad receiving the note chose to obtain cars it would have to lease them back

to The Pullman Company until December 31, 1948 (but not thereafter). If cash were chosen, it could not be obtained before June 30, 1948, and was payable only to the extent money was available in the separate fund. This plaintiff decided, in 1947, not to take sleeping cars but to await the cash payment. In February 1949, The Pullman Company redeemed all outstanding car notes in cash, and at that time plaintiff received $98,863—the face amount of the note. Interest was paid by The Pullman Company, as provided in the note, in 1947, 1948, and 1949. The plaintiff reported this interest as income but did not report the principal amount of the note at any time.

The Commissioner of Internal Revenue assessed and collected income tax, for 1949, on the $98,863 received in that year from The Pullman Company. Plaintiff paid the deficiency (and interest) and now sues for a refund.

The parties have narrowed the controversy to the single issue of the proper year in which the $98,863 was taxable, 1947 or 1949 (or perhaps both). Both sides assume (at least for this case) that the distribution by The Pullman Company was a taxable dividend; but they differ as to the time when that dividend was received. The taxpayer opts for the earlier year while the Government asserts that the Internal Revenue Service correctly chose 1949.

The Internal Revenue Code of 1939 defined a "dividend" as "any distribution made by a corporation to its shareholders, whether in money or in other property" (Section 115(a)), and the regulations required a taxable distribution by a corporation to "be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands" (Treas.Reg. 111, § 29.115–1). There is, of course, no problem as to the amount to be included in gross income where the dividend is paid in cash; with respect to valuation of a dividend in kind, Section 115(j) of the Code provided that "[i]f the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder." Under this governing law—established by the Code and the regulations—we must decide three points: first, what was the distribution made by The Pullman Company to plaintiff, i. e., the car note or the cash payment; second, in what year (1947 or 1949) was this distribution unqualifiedly made subject to plaintiff's demands; and, third, what was the amount of the distribution to be included in gross income. Though theoretically separable, these three problems are closely intertwined in this case, and we shall discuss them together.

■■ Plaintiff obtained its car note in August 1947. It says—and defendant denies—that this note was valuable "property" in itself, received at that time. Promissory notes are usually such property, or the equivalent of cash, in the hands of the obligee (cf. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 468–469, 53 S.Ct. 257, 77 L.Ed. 428 (1933); Wolfson v. Reinecke, 72 F.2d 59 (C.A.7, 1934); Cowden v. Commissioner, 289 F.2d 20, 24 (C.A.5, 1961); Turner v. Commissioner, 303 F.2d 94, 96 (C.A.4, 1962) cert. denied, 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230), but that proposition is not universally true (cf. Schlemmer v. United States, 94 F.2d 77 (C.A.2, 1938); Cowden v. Commissioner, supra; Hudson v. Commissioner, 11 T.C. 1042, 1050–1051 (1948), aff'd per curiam, Hudson Engineering Corp. v. Commissioner, 183 F.2d 180 (C.A.5, 1950); Crosby v. Commissioner, 14 B.T.A. 980 (1929)). Here, we believe, the note was so framed that it did constitute property in taxpayer's possession as soon as it was received.[1] At that moment the taxpayer

1. Since taxpayer received "property", i. e., the note, in 1947, it is immaterial whether it was on the accrual or the cash basis. Moreover, the Treasury Regulation, supra, expressly provide that dividends are to be taken into income "when the cash or other property is unqualifiedly made subject to * * * [the taxpay-

was in a position to demand valuable heavyweight sleeping cars in payment. The note was the equivalent of a declared dividend of sleeping cars which could be taken at any time in 1947. Under the Code and the regulations, the immediate availability of those cars gave rise to present income. Treasury Regulations 111, § 29.115–1 called for the inclusion in shareholders' gross income of property distributed by the corporation whenever it is "unqualifiedly made subject to their demands." Regulations 111, § 29.42–2, establishing a general rule for determining when income has been received, likewise fits this case:

> "Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition * * *."

The sleeping cars referred to in the note were "made available" to the taxpayer in 1947 (subject to leasing back to The Pullman Company for a temporary period). They could be drawn in that year and their receipt was thus brought within the taxpayer's own control and disposition at that time.

The defendant objects to this conclusion on three main grounds. It says, first, that the sleeping cars were not made available "without any substantial limitation or restriction" (as Treas.Reg. 111, § 29.42–2, supra, provides) because plaintiff was required, by its agreement with the other railroads, to lease back the cars to The Pullman Company until December 31, 1948, and to allow the Company to operate them during that period. But this minor requirement for a lease-back of no more than 17 months did not so fetter the taxpayer's use of the property as to remove its distribution from the category of income. The Commissioner of Internal Revenue recognized this himself when he decided (see finding 11(b)), in responding to a request for a ruling by other participating railroads, that "the railroad companies were in receipt of dividend distributions at the time they elected to claim assigned sleeping cars by the surrender of their car notes" —even though these companies had also agreed to the lease-back arrangement.

■ Secondly, defendant urges that plaintiff cannot have received income in 1947, through the availability of the cars, because it decided in that year not to take cars but to demand cash. This, too, is no answer since the cars were always available in 1947 under the terms of the note; the taxpayer's internal decision not to exercise the option—subject, of course, to change until December 31, 1948— would not mean that the cars did not remain "unqualifiedly * * * subject to [its] demands." A taxpayer's own choice to leave untouched money or property which is otherwise subject to his call does not ordinarily defer the receipt of income. See 2 Mertens, Law of Federal Income Taxation (1961), §§ 10.01, 10.05, 10.06; cf. Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930); Williams v. United States, 219 F.2d 523 (C.A.5, 1955).

Thirdly, defendant insists that the car notes had no independent significance but

er's] demands." It has been held that dividend income must be reported, even by an accrual basis taxpayer, at the time of receipt and not when the right to receipt is determined. Tar Products Corp. v. Commissioner, 130 F.2d 866, 143 A.L.R. 593 (C.A.3, 1942); Commissioner v. American Light & Traction Co., 156 F. 2d 398, 167 A.L.R. 300 (C.A.7, 1946); Beneficial Corp. v. Commissioner, 202 F. 2d 150 (C.A.3, 1953), affirming 18 T.C. 396 (1952); Frelbro Corp. v. Commissioner, 36 T.C. 864, 871 (1961).

were issued only as part of the mechanics of a distribution by The Pullman Company among its stockholders of the sleeping cars (or their cash equivalent). We have been given no adequate reason why the notes should be disregarded. They are unusual in form and designed to meet an unusual situation, but nothing in the law of taxation directs the compulsory elimination of uncommon obligations. Nor is there any rule that notes with a present value are to be overlooked simply because they are non-negotiable and non-assignable.[2] In form and substance, these were promissory notes, payable immediately in heavy-weight sleeping cars or after a year or so in money. As such notes, we have shown, they were property in the hands of the taxpayer in 1947. Only by fiat could we ignore them.

The remaining facet of the case concerns the value of the car note in 1947. If that amounted to less than the $98,863 paid in cash in 1949, there could (but not necessarily) be a further receipt by taxpayer of taxable gain in 1949—the year in suit. Such further gain for 1949[3] would have to be taken into account because, in this tax refund suit, taxpayer can only recover for that year to the extent it shows that no income tax was payable. Lewis v. Reynolds, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932), Reinecke v. Spalding, 280 U.S. 227, 232–233, 50 S.Ct. 96, 74 L.Ed. 385 (1930); Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Globe Gazette Printing Co. v. United States, 13 F.Supp. 422, 82 Ct.Cl. 586, 592 (1936), cert. denied, 298 U.S. 682, 56 S.Ct. 952, 80 L.Ed. 1403 (1936).

On the record and findings we have, the value of this car note in 1947 remains unclear. Plaintiff urges that it had its full face value, either because the cars were worth that much or because the promise to pay the face amount in cash in 1948, plus interest, was worth that much in 1947. Defendant leaves the issue unanswered but suggests that the court must decide the "difficult question" whether the 1947 value of the note is measured by the worth of the cars (which taxpayer did not take) or by the value of taxpayer's right to receive the cash in the future.

Under one oft-repeated principle of income taxation, the right which the note gave the taxpayer in 1947 to obtain a money payment in 1948 (or 1949) would not have any market value, or represent realizable income, in the earlier year. This is because the note was non-negotiable, non-assignable, and non-transferable. Unlike ordinary promissory notes or assignable paper, taxpayer would be unable to turn this obligation (if all that it did was to promise money in the future) into immediate cash (even at a discount) by selling or pledging it, or otherwise putting it up as security for a loan. There would be no way in which the holder of such a note could realize on it prior to the due date so as to entitle the Revenue Service to say that receipt of the note was tantamount to receiving cash. True, the obligor (The Pullman Company) was solvent and sound, and would doubtless honor its promise in due course. But the debtor's solvency and willingness to pay the note when due is not the equivalent of the obligee's having a present right or power to obtain money through use of the note. It has frequently been said or implied that an obligation to pay in the future can have a current market value, or represent current income, only if it is currently capable of somehow being traded, disposed of, or realized—i. e., negotiated, assigned, transferred, or paid. See, e. g., Cowden v. Commissioner, supra, 289 F.2d 20, 22, 23–24 (C.A. 5, 1961); Cros-

---

2. Cases in which the Tax Court held that non-negotiable notes had no value in the year of receipt turned on the particular terms of the note or the contingencies of payment, not on the mere fact of non-negotiability. Crosby v. Commissioner, supra, 14 B.T.A. 980 (1929); Hudson v. Commissioner, supra, 11 T.C. 1042,

1050–1051 (1948), aff'd, Hudson Engineering Corp. v. Commissioner, 183 F. 2d 180 (C.A.5, 1950).

3. Taxpayer, as we have noted, included no part of the $98,863 in its return for 1949.

by v. Commissioner, supra, 14 B.T.A. 980 (1929); Humphrey v. Commissioner, 32 B.T.A. 280 (1935); C. W. Titus, Inc. v. Commissioner, 33 B.T.A. 928 (1936); Kleberg v. Commissioner, 43 B.T.A. 277, 289 (1941); Freeman v. Commissioner, 4 T.C. 582, 584–585 (1945); Hudson v. Commissioner, supra, 11 T.C. 1042, 1050–1051 (1948), aff'd per curiam, Hudson Engineering Corp. v. Commissioner, 183 F.2d 180 (C.A. 5, 1950); Fischer v. Commissioner, 14 T.C. 792, 801–802 (1950); 2 Mertens, Law of Federal Income Taxation (1961), Sec. 10.02 (p. 7), Sec. 11.05 (pp. 12–16), Sec. 11.06, Sec. 11.07, (pp. 21–23); cf. Bedell v. Commissioner, 30 F.2d 622, 624 (C.A. 2, 1929) ("* * * it is absurd to speak of a promise to pay a sum in the future as having a 'market value', fair or unfair", per L. Hand); United States v. Christine Oil & Gas Co., 269 F. 458, 460 (W.D.La., 1920), citing United States v. Schillinger, 14 Blatchf. 71 ("In the absence of any special provision of law to the contrary, income must be taken to mean money, and not the expectation of receiving it, or the right to receive it, at a future time").

The difficulty with uncritical acceptance of this principle for our case is that it has not been applied without exception to all monetary obligations. The courts have held that, where an employer purchases for its employee a non-forfeitable and unconditional annuity contract that is not assignable and has no cash surrender value in the purchase year, the employee is nevertheless taxable in that year (as additional compensation) on the amount expended by the employer to buy the annuity. Brodie v. Commissioner, 1 T.C. 275 (1942); Oberwinder v. Commissioner, 147 F.2d 255, 258–259 (C.A. 8, 1945); Freeman v. Commissioner, 4 T.C. 582, 585 (1945); Anderson v. Commissioner, 5 T.C. 1317, 1324–1325 (1945); Hackett v. Commissioner, 159 F.2d 121 (C.A. 1, 1946); United States v. Drescher, 179 F.2d 863, 865–866 (C.A. 2, 1950), cert. denied, 340 U.S. 821, 71 S.Ct. 53, 95 L.Ed. 603 (1950); Morse v. Commissioner, 17 T.C. 1244, 1248–1249, 1252 (1952), aff'd 202 F.2d 69 (C.A. 2, 1953). Since the employees could not receive any money from the annuities during the taxable year, directly or indirectly, but had to wait for later years, the holdings in these cases seem to clash with the general principle that taxability in a particular year follows only upon some realizable value during that period. In Drescher, supra, the Second Circuit appears to have recognized this discrepancy (179 F.2d at 864–865, 866), but it nevertheless chose to follow and extend its prior ruling in Ward v. Commissioner, 159 F.2d 502 (2 Cir. 1947), involving an assignable annuity contract, to cover a non-assignable agreement—holding that such a contract does and can have present value. Although both the majority and the dissenting opinions [4] are directed to that particular agreement, there is a general reach to the discussion of valuation which cannot be disregarded.[5] Mertens' text also seems somewhat wary of any flat doctrine that nontransferability deprives an obligation of currently taxable value. Sec. 11.03 (pp. 6–8); Sec. 11.05

4. The dissent was solely on the measure of present value, not its existence.

5. The majority in Drescher said (179 F. 2d p. 865): "It cannot be doubted that in 1939 the plaintiff received as compensation for prior services something of economic benefit which he had not previously had, namely, the obligation of the insurance company to pay money in the future to him or his designated beneficiaries on the terms stated in the policy. That obligation he acquired in 1939 notwithstanding the employer's retention of possession of the policy and notwithstanding its non-assignability." The opinion then mentioned the following as indicating that the annuity had some present value (179 F.2d pp. 865–866): (a) the right to receive income payments in the future has present value because one can purchase such future rights to income; (b) there is present value in the assurance of payment to his beneficiary if the annuitant should die; and (c) there is the possibility of the annuitant's receiving cash, currently, "by contracting with a putative third person to hold in trust for him any payments to be received under the annuity contract."

(pp. 15–16); Sec. 11.06 (pp. 17–18, 20). See also Helvering v. Bruun, 309 U.S. 461, 60 S.Ct. 631, 84 L.Ed. 864 (1940).

We have concluded, however, that the non-assignable annuity cases represent an exception to the general doctrine, rather than a competing principle deserving of further development to include the present case. Perhaps those decisions turn on the special fact that the taxpayer's beneficiary would recover, in the taxable year, the premium paid for the annuity if the taxpayer should die within that period; such a possibility of present recovery might give the otherwise unrealizable obligation a current value.[6] Or perhaps the impelling force behind those rulings was the need to close a loophole through which the employee-taxpayers could escape paying income taxes on monies expended by their employers for their benefit. In any event, the theory of this line of cases has thus far been confined to its own sphere. To extend it to taxpayer's note would make another, and wider, breach in the accepted principle that an obligation has to be realizable during the year—in some way and to some extent—before it can be taxed at that time. The advantage of that general rule is the relative ease and accuracy of determining when (and by how much) receipt of an obligation constitutes income. The test is the practical one of the market, in its broadest sense. To go further and require the current assessment of the worth of non-realizable or non-marketable obligations—instead of awaiting the actual receipt of money under those obligations—would thrust both taxpayers and the Internal Revenue Service into the briar-patch of valuation-sans-market. The new principle would necessarily have to be expanded, in logic, from fixed but non-realizable liabilities to cover contingent obligations (which can also be "valued")—and the result would soon be a profound shift in the tax treatment of obligations to pay money or transfer property in the future. The onerous task of valuing liabilities not readily evaluated would become much more frequent; and these added burdens (including the weight of increased litigation) would not appear to be counterbalanced by any significant improvement in the effective administration of the federal revenue laws. If the change is to be made, it seems to us it should be made by Congress (or perhaps the Treasury) after considering all the consequences, not in the *ad hoc* course of case-by-case adjudication.

It follows that the 1947 value of taxpayer's non-transferable note should not be measured by its right in 1947 to receive cash in 1948 or 1949, but by its present right to receive sleeping cars in 1947. Taxpayer asserts that the sleeping cars were worth the full face value of the note, but the Trial Commissioner has made no finding to that effect and the present record is inadequate for us to make such a finding. The face value of the note may have been equivalent to the cars' book value, but we are uncertain whether the book value would correspond to the then market value of heavyweight sleeping cars. Unless the parties can stipulate the value of the cars, that issue will have to be determined by the Trial Commissioner in the further proceedings under Rule 38(c). In the event he finds the value of the cars to be less than the face amount of the note, the Commissioner should also consider whether there was a "spill over" to 1949 for which taxpayer should be charged before recovering any excessive tax collected for that year.

Our conclusion is that plaintiff was taxable on the car value of its note solely in 1947, and not in 1949, unless there was the "spill over" to 1949 to which we have referred. Plaintiff is entitled to recover, with interest as provided by law, and the amount of recovery will be determined pursuant to Rule 38(c).

---

6. See Drescher, supra, 179 F.2d at 866; Hyde v. Commissioner, 301 F.2d 279, 283 (C.A.2, 1962).