Behlmer D. Laramy and Adeline M. Laramy v. Commissioner. Valley Home Furniture v. Commissioner.
Laramy v. Commissioner
Docket Nos. 3173-64, 3174-64.
United States Tax Court
T.C. Memo 1966-152; 1966 Tax Ct. Memo LEXIS 133; 25 T.C.M. (CCH) 809; T.C.M. (RIA) 66152; June 28, 1966
*133 Harry E. Barnes, 14541 Hamlin, Van Nuys, Calif., for the petitioners. Paul G. Wilson, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income tax of petitioners in the years and amounts as follows: Docket No.
Year
Deficiency
3173-64
1959
$ 348.98
1960
3,734.66
1961
[1] 9,521.63
F/Y Ended
April 30
3174-64
1959
$2,061.84
1960
3,655.04
1961
1,686.82
1962
[2] 21.13
*134 The issues presented for decision are as follows: (1) Does the $24,758.39 aggregate amount represented by *135 three promissory notes issued to Behlmer D. Laramy constitute income properly taxable to petitioners in Docket No. 3173-64 entirely in 1961; [1] (2) alternatively, does the amount represented by each of the three above-mentioned promissory notes constitute income to petitioners in Docket No. 3173-64 in the years each was received by Behlmer D. Laramy; (3) alternatively, is petitioner in Docket No. 3174-64 entitled to deductions in its taxable fiscal years ended April 30, 1959, 1960, and 1961, for accrued and unpaid salaries in connection with which it issued promissory notes on May 1, 1959, May 1, 1960, and May 1, 1961, respectively; and (4) are petitioners in Docket No. 3173-64 entitled to deductions for certain alleged business expenses in 1959, 1960, and 1961. Respondent has abandoned his argument that the cancellation by Behlmer D. Laramy of an indebtedness owed to him by corporate petitioner in Docket No. 3174-64 for accrued salary resulted in the receipt by said corporate petitioner of income to the extent of indebtedness forgiven which is taxable in 1961. Findings of Fact Some of the facts were stipulated and *136 as stipulated are so found. Petitioners Behlmer D. and Adeline M. Laramy (hereinafter collectively referred to as the Laramys or as the buyers) filed their Federal joint income tax returns for the taxable calendar years 1959, 1960, and 1961 on the cash basis with the district director of internal revenue, Los Angeles, California. Petitioner Valley Home Furniture (hereinafter referred to as the corporation) is a California corporation which filed its Federal corporate income tax returns for the fiscal years ended April 30, 1959, through April 30, 1962, on an accrual basis with the district director of internal revenue, Los Angeles, California. The corporation was engaged in the business of selling retail household furnishings during the years in issue. By agreement dated January 1, 1959, the buyers contracted to purchase from Emil and Charlyne M. Obegi (hereinafter collectively referred to as the sellers) all of the outstanding capital stock of the corporation. On January 1, 1959, the sellers owned all of the 500 shares of outstanding capital stock of the corporation. Under the above-said stock purchase agreement, the buyers agree to purchase all of the corporation's stock *137 from the sellers for $46,213.75, plus interest at 5 percent per annum from January 1, 1959, payable in amounts of $1,000 or more per month beginning April 1, 1959. Upon payment in full of the total amount of $46,213.75, the sellers were to deliver the shares of the corporation's capital stock to the buyers. The written resignations of the sellers as officers and directors of the corporation were to be delivered to the buyers at that time. In clause 3 of the stock purchase agreement the sellers represented, inter alia: (e) Between January 1, 1959 and the date of delivery of the capital stock by Sellers to Buyers, the Company will not (1) transfer, sell, or otherwise dispose of any corporate property or assets material to the operation of its business other than in the ordinary and usual course of its business as heretofore conducted; (2) create, participate in, or agree to the creation of, any liens or encumbrances on its corporate property, save and except liens for current taxes and liens treated in the usual and ordinary course of its business as heretofore conducted; (3) enter into any leases, contracts, or agreements of any kind or character or incur any liabilities, save *138 and except those to which it is presently committed and which are disclosed herein, or in the exhibits hereto, purchase orders for merchandise and supplies, and agreements to sell merchandise to customers arising in the ordinary and usual course of business as heretofore conducted; (4) make any payments or distributions to any of its officers, stockholders, or employees, save and except wages and salaries made to employees in the ordinary and usual course of the business as heretofore conducted; (5) amend or repeal its articles of incorporation or by-laws nor issue any shares of capital stock in addition to, and other than, the shares heretofore issued. Clause 6 of the stock purchase agreement provided that Behlmer D. Laramy (hereinafter referred to as Behlmer) was to be employed as general manager of the corporation and was to receive compensation for his services in the following manner: (1) Cash payments in the net amount of $700 per month for January, February, and March 1959, and in the net amount of $1,700 per month thereafter and (2) all corporate net income in excess of Behlmer's gross salary in the form of nonnegotiable promissory notes executed by the corporation in favor *139 of Behlmer. [2] Payment could be made in a form other than promissory notes only by agreement between the sellers and the buyers. Paragraph 8 of the stock purchase agreement provided: 8. SELLERS' RIGHT OF RE-ENTRY: If the corporation's books and records indicate that Buyers' management has not been successful, or if in the sole discretion of the Sellers the credit and/or business reputation of the Company has been damaged, Sellers reserve the right to return to active management of the business; in the event such action becomes necessary, Sellers and Buyers will make such amendments to this agreement as are necessary in the circumstances provided, however, that such amendments shall be mutually agreed upon by both Buyers and Sellers; and it is further agreed that impairment of the Net Worth of the Company to the extent of $10,000.00 will be prima facie evidence that Buyers' management has not been successful, and that the Net Worth of $46,213.75 * * * will be the basis for determining such impairment. *140 Loss of Net Worth to the extent of the first $10,000.00 will be borne by Buyers; any loss in excess of $10,000.00 will be borne by Sellers. [Emphasis supplied.] The buyers agreed in the stock purchase contract to advance $10,000 to the corporation's working capital before May 1, 1959. Such advance was to be evidenced by a nonnegotiable promissory note executed by the corporation in favor of the buyers. However, the buyers never made such advance. The agreement also provided that mercantile sources and credit agencies may be apprised of LARAMY'S acquisition of an interest in the business in order to minimize the adverse credit effects of a total change in ownership and management upon transfer of the capital stock in the future. Behlmer served as general manager of the corporation during the period beginning January 1, 1959, through September 21, 1961. During its fiscal years ended April 30, 1959, 1960, and 1961, and the taxable period May 1, 1961, to September 30, 1961, the corporation paid to Behlmer the following cash amounts as salary: Period
Amount
F/Y ended 4/30/59
$ 5,800
F/Y ended 4/30/60
25,200
F/Y ended 4/30/61
30,300
5/1/61 to 9/30/61
13,500
Total
$74,800
*141 The foregoing cash amounts were deducted by the corporation from its income in its Federal income tax returns for the years in issue, and were reported by the buyers as income in the Federal joint income tax returns for the calendar years 1959, 1960, and 1961. During the period in which the stock purchase agreement was in effect, Behlmer withdrew, with Emil Obegi's consent, cash amounts from the corporation in excess of the cash amounts owing to him as compensation. Portions of these amounts were paid over to Obegi as part of the purchase price. In a few instances, Behlmer retained such excess funds for family needs. Nonnegotiable promissory notes were issued by the corporation on May 1, 1959, May 1, 1960, and May 1, 1961, respectively, pursuant to the stock purchase agreement and delivered to Behlmer on or about the same dates. Said notes were prepared by Harry E. Barnes, who was the sellers' attorney at that time and who represents petitioners herein. The words "to the order of" (following the words "for value received, I (or we, jointly or severally) promise to pay") were stricken from the face of the promissory notes and the words "only to" (followed by "Behlmer D. Laramy") *142 were substituted therefor. The notes were drawn so as to be payable by the corporation in the future despite the fact that the stock purchase agreement merely called for nonnegotiable promissory notes. The note issued on May 1, 1959, in the amount of $6,872.77 was made payable on May 1, 1963; the note issued on May 1, 1960, in the amount of $12,235.45 was made payable on May 1, 1964; and the note issued on May 1, 1961, in the amount of $5,650.17 was made payable on May 1, 1964. Entries on the books of the corporation reflect liabilities for additional salary payable to Behlmer accrued as of each of the following dates in the amounts shown below: Date of Accrual
Amount
4/30/59
$ 6,872.77
4/30/60
12,235.45
4/30/61
5,650.17
Total
$24,758.39
The face amounts of the above-mentioned promissory notes were deducted as salary expense by the corporation from its income in the corporation income tax returns filed by it covering the fiscal years ended April 30, 1959, 1960, and 1961, respectively, and were not reported by the buyers as income in their Federal income tax returns at any time. The buyers never defaulted in payment for the stock. On September 21, 1961, all *143 of the capital stock of the corporation was transferred to the buyers and Behlmer became president of the corporation. Prior thereto, neither Behlmer nor Adeline M. Laramy held any stock in the corporation. On September 30, 1961, Behlmer cancelled the three promissory notes. Obegi considered that Behlmer took over the business in January of 1959. Behlmer personally incurred the following costs in entertaining customers of the corporation: Year
Amount
1959
$ 88
1960
150
1961
110 The purpose of such entertainment was to impress favorably potential customers in the hopes of getting their business. Behlmer would usually entertain such persons at his home. Three particular potential customers whom Behlmer entertained during the years in issue eventually purchased in excess of $30,000 worth of furniture from the corporation at full retail price. During the years in issue, Behlmer used his own car in connection with the corporation's business. The corporation paid for the gasoline and oil used by Behlmer's car, and Behlmer paid for repairs, licenses, and insurance on said car. In his notice of deficiency sent to petitioners in Docket No. 3173-64, respondent *144 disallowed the deductions taken by petitioners for entertainment and automobile expenses in their Federal joint income tax returns for the calendar years 1959, 1960, and 1961 on the grounds that such expenses had not been substantiated. He also determined that said petitioners were taxable in an amount equal to the face amount of the promissory notes received by Behlmer from the corporation in the amounts and dates indicated below: Year of
inclusion in
Year
taxable
received
Amount
income
4/30/60
$ 6,872.77
1960
4/30/61
$12,235.45
9/30/61
5,650.17
17,885.62
1961
In his amended answer in Docket No. 3173-64, respondent alleges alternatively that if petitioners therein did not realize income in the taxable year 1960 in the amount of $6,872.77 and in the taxable year 1961 in the total amount of $17,885.62 by reason of their receipt of the promissory notes issued to Behlmer, then petitioners realized the total of the said amounts ($24,758.39) as income entirely taxable in the year 1961. In his notice of deficiency sent to petitioner in Docket No. 3174-64, respondent determined that the deductions claimed by you for salaries accrued *145 in accordance with the following schedule are not allowable under the provisions of section 267 or any other section of the Internal Revenue Code of 1954. F.Y. 4/30/59
$ 6,872.77
F.Y. 4/30/60
12,235.45
F.Y. 4/30/61
5,650.17
Opinion The issues for decision are: (1) Whether the amount represented by each of three promissory notes issued to Behlmer by the corporation in 1959, 1960, and 1961 constituted income to the Laramys in the years in which such notes were received by Behlmer; (2) Alternatively, whether the $24,758.39 aggregate amount represented by the abovesaid three promissory notes constituted income to the Laramys entirely in 1961; (3) Alternatively, whether the petitioner in Docket No. 3174-64 is entitled to deductions in its taxable years ended April 30, 1959, 1960, and 1961, for accrued and unpaid salaries represented by the promissory notes issued by it on May 1, 1959, May 1, 1960, and May 1, 1961, respectively; and (4) Whether the Laramys are entitled to deductions for certain alleged business expenses in 1959, 1960, and 1961. We shall first consider the issue as to whether the face amount represented by each promissory note was income *146 to the Laramys in the year it was received by Behlmer. Respondent argues that the amount represented by each promissory note constitutes income to the buyers in the years in which the notes were received by Behlmer on the grounds that (1) the amounts represented by the notes were constructively received by Behlmer when the notes were received or (2) the notes had a fair market value equal to their face amounts. For reasons that will shortly become apparent, we shall first consider respondent's theory of constructive receipt. Under the doctrine of constructive receipt, a taxpayer's own choice to leave untouched money which is otherwise subject to his call does not defer the receipt of income for Federal tax purposes. Denver & Rio Grande Western Railroad Co. v. United States, 318 F. 2d 922 (Ct. Cl., 1963). The question of the applicability of said doctrine arises when the form of a transaction indicates that the receipt of income derived from the transaction is to be delayed until another year. In such case, it must be determined whether, despite the form of a transaction, *147 the taxpayer had such control over the amount in question that he constructively, even though not actually, received it. John A. Brander, 3 B.T.A. 231 (1925). Thus, the principal factor to be determined is the substance of the apparent limitations which prevent the taxpayer from receiving the payment due in cash or other property during the current rather than a later period. If the limitations on control are of real substance, there will be no constructive receipt; if the limitations are akin to a sham, there will be constructive receipt. Whether an item is subject to the taxpayer's demand without qualification or reservation is usually a question of fact. The burden is upon the taxpayer to show that the amounts in issue were not unqualifiedly subject to his demand. Paul E. Weiss, 7 B.T.A. 615 (1927). We do not believe that the Laramys have met their burden. The following facts are relevant to the application of the doctrine of constructive receipt herein. Clause 6 *148 of the stock purchase agreement (a copy of which is before us) provides that certain cash amounts were to be paid Behlmer as compensation for his services as general manager of the corporation. It further provides that Behlmer was to be paid as additional compensation for his services as general manager of the corporation all corporate net income, in excess of the above-said cash amounts, in the form of nonnegotiable promissory notes executed by the corporation in favor of Behlmer. The precise amount of each note was to be determined as soon as possible after the end of the fiscal year. Clause 6 of the agreement also prohibited the payment of such amounts in any form other than by promissory notes unless the parties agreed to a different form of payment. In accordance with clause 6 of the stock purchase agreement, the corporation issued, on May 1, 1959, May 1, 1960, and May 1, 1961, three promissory notes in favor of Behlmer which were, ostensibly, nonnegotiable. [3] Each of the aforesaid notes was received by Behlmer on or about the same date as issued by the corporation. [4] (These notes are also before us.) Since the only deficiency determined by respondent against petitioners in *149 Docket No. 3173-64 for the taxable year 1959 relates to certain automobile and entertainment expenses, we need not decide whether the face amount of the note received by Behlmer in 1959 constitutes income to said petitioners in that year since that question is not in issue. Section 6214, Internal Revenue Code of 1954. Thus, we need decide only whether the face amount of each note received in 1960 and 1961, respectively, constitutes income to these petitioners in 1960 and 1961. *150 The notes received by Behlmer on or about May 1, 1960, and May 1, 1961, were payable on May 1, 1964. However, there is nothing in the record which enables us to ascertain (1) how the parties agreed upon the specific deferment provisions provided in the notes, (2) when the notes were actually drawn up, or (3) the circumstances under which the notes were actually issued. Behlmer never received payment on the notes, having cancelled them in 1961 before they were due. However, during the period in which the stock purchase agreement was in effect, Behlmer, with Emil Obegi's consent, withdrew cash amounts from the corporation in excess of the amounts of cash he was to receive pursuant to clause 6 of said agreement. [5] (The exact amount of such "excess" cash receipts cannot be determined from the record.) The facts summarized above disclose what we consider to be the crucial factor in this issue - that is, (1) clause 6 of the stock purchase agreement provides, inter alia, for payment to Behlmer of certain amounts of corporate net income in the form of nonnegotiable *151 promissory notes without any specification as to time of payment or deferral of payment and (2) the notes themselves (which were issued in each case after the right thereto was earned) provide that payment on each was to be deferred some three and four years after issuance thereof. There is not sufficient evidence in the record to establish that the parties at the time of the execution of the stock purchase agreement (1) contemplated the deferral of payment on the notes for three and four years after date of issuance or (2) contemplated payment on the notes at any time other than (a) upon demand or (b) in the same calendar year in which each note was received. Although Emil Obegi was before this Court as a witness in the trial proceedings, his testimony gives no indication that the parties intended in the stock purchase agreement to defer payment on the notes provided for in clause 6 thereof beyond the years in which each was received. Nor did he imply that he had desired the amounts represented by the notes to remain in the corporation as a form of security until the buyers had completed payment on the purchase price. Emil Obegi merely testified that the notes were a method devised *152 by his attorney (who also represents petitioners herein)to give Behlmer the profits of the corporation. Moreover, the first note received by Behlmer pursuant to the contract was issued by the corporation some four months after the stock purchase agreement was executed and does not serve to construe clause 6 of that agreement as intending deferred payment in the absence of any other reliable evidence tending to establish such fact. Despite any inferences that might be gleaned from the record indicating a contractual intention to defer payment, they are hardly adequate as a basis to sustain the Laramys when confronted, as we are, with a total dearth of any substantial and affirmative evidence to buttress such inferences. Under California law pertaining to bills and notes, a promissory note which does not state time of payment is held to be payable on demand. [6] We believe that it is reasonable to extend the aforesaid rule of law to the circumstances involved herein - that is, a contract which gives *153 rise to a right to receive promissory notes, but fails to state the date on which such notes are payable, gives rise to a right to receive notes payable on demand. [7]
In the absence of any evidence to the contrary, we are of the opinion that the stock purchase agreement merely established the amounts owing Behlmer and the manner in which such amounts were to be distributed to him, to wit - in the form of nonnegotiable promissory notes, but did not provide, nor was intended to provide, nor can be construed to provide, for payment thereon to be deferred to years beyond those in which each note was received. Therefore, it was only after Behlmer had earned the right to income in accordance with the stock purchase agreement that he agreed to accept notes deferring payment beyond the calendar years in which such notes *154 were received. Furthermore, it appears to us that, in all probability, clause 6 of the stock purchase agreement was purposefully written without any specific deferred payment date so as to allow Behlmer to receive notes payable at any date he chose. We can see no meaningful distinction in applying the doctrine of constructive receipt between (1) a taxpayer who at the end of Year I agrees by contract to receive payment in Year II for amounts earned prior to the execution of said contract and (2) a taxpayer who at the end of Year I accepts notes deferring payment until Year II on amounts earned prior to issuance of the notes under the circumstances presented herein. The facts in Ray S. Robinson, 44 T.C. 20 (1965), distinguish that case from the instant case. There, the employment contract which provided for the salary to be received by the taxpayer-employee specifically directed that a portion of the salary was to be deferred to years beyond those in which (1) the contract was executed and (2) the taxpayer-employee's services were rendered. In the case at bar, the stock purchase agreement covering Behlmer's compensation did not, specifically or otherwise, provide for *155 the deferment of that portion of his salary to be received in the form of notes. We have found that it was only after his services had been rendered that deferred payment of the notes was agreed upon by the parties. The Laramys have not attempted to show that at any time involved herein (1) the corporation was unable to make payment on the notes or (2) payment on the notes would result in financial hardship to the corporation. Moreover, the facts appear to be otherwise, to wit - Behlmer was able to withdraw cash amounts from the corporation in excess of the cash amounts owing him under clause 6 of the stock purchase agreement. [8]
On the basis of the foregoing, we believe that, under the circumstances herein, Behlmer, by accepting notes deferring payment beyond the taxable years, constructively received the face amount of (1) the note dated May 1, 1960, in 1960 and (2) the note dated May 1, 1961, in 1961 and, therefore, such face amounts constitute income to the Laramys *156 in those two years alone. Since we have found that the face amounts of the two notes received by Behlmer in 1960 and 1961 constitute income in 1960 and 1961, respectively, to the Laramys on the theory of constructive receipt, we need not consider respondent's alternative argument that the face amounts of the two notes constitute income to said petitioners in 1961. Because there was no issue raised as to whether the note received by Behlmer in 1959 constitutes income in that year to the Laramys, we must consider respondent's alternative argument that the face amount of such note constitutes income in 1961 when Behlmer received all of the outstanding shares of the corporation's stock from the sellers and thereafter cancelled all of the notes. Respondent's alternative argument to the effect that the Laramys realized income in 1961 in the total face amount of the three promissory notes received by Behlmer was first raised by respondent in his amended answer. [9] Thus, the burden of proof for this issue rests upon respondent which, accordingly, requires him to establish not only the legal premises *157 but also all the material facts necessary to support his claims. Kimbell-Diamond Milling Co., 10 T.C. 7 (1949). We have found as a fact that the note issued by the corporation on May 1, 1959, was received by Behlmer in 1959. In order to constitute income under any legal theory in 1961 to the individual petitioners herein, the note received by Behlmer in 1959 must not have constituted income to said petitioners in such earlier year. Respondent has failed to prove that the note received by the individual petitioners in 1959 was not income to them in that year. Accordingly, we cannot possibly sustain his contention that the face amount of the 1959 note was income to these petitioners in 1961. Therefore, we hold for petitioners on this issue. Respondent concedes that if receipt of the promissory notes by Behlmer is deemed to be "payment" in the years of receipt, the amounts in question were properly accrued and deductible by the corporation in the years in which the notes were issued. Due to our holding that the face amounts of the notes *158 received by Behlmer in 1960 and 1961 were constructively received by the individual petitioners in those years, we need not consider respondent's second alternative argument that the face amount of the notes was not deductible by the corporation under section 267(a)(2), Internal Revenue Code of 1954, at least with respect to the notes received in 1960 and 1961. However, with respect to the note received by Behlmer in 1959, we must consider the applicability of section 267(a)(2) since the question of whether the face amount of the 1959 note was income to the individual petitioners in 1959 was not in issue. The purpose of section 267 is to eliminate the former tax avoidance practice of a corporation accruing unpaid expenses and interest to a closely related taxpayer who, because he is on the cash basis, reports no income. Because of the relationship between the taxpayers, payment might never be required or might be postponed until the related taxpayer has offsetting losses. Young Door Co., Eastern Division, 40 T.C. 890 (1963). *159 Under section 267(a)(2), no deduction is allowed for expenses otherwise deductible under section 162, Internal Revenue Code of 1954, (A) where such expenses are not paid during the taxable year of the taxpayer or within 2 1/2 months following the close thereof, and the amount of the expenses is not includable in the gross income of the person to whom payment is to be made; (B) if, by reason of the latter's method of accounting the amount is not, unless paid, includable in the latter's gross income for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) if, at the close of the taxpayer's taxable year, or within 2 1/2 months thereafter, both the payor and the payee are related persons as defined in any of the enumerated categories set out in section 267(b). Thus, there are two questions that must be answered in the affirmative in order that section 267 applies, to wit - (1) whether the requisite relationship existed under section 267(b) and (2) whether the expenses were paid or constructively *160 or otherwise received within the prescribed period. Section 267(a)(2); Regs. section 1.267(b). The relevant portion of section 267(b) provides as follows: (b) Relationships. - The persons referred to in subsection (a) are: * * *
(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; Although the corporation described in section 267(b)(2) is generally referred to as a "controlled corporation," the term is a misnomer, since the control, i.e., voting control, is not required. Voting control would have been required under the version of section 24(a)(6) of the Revenue Bill of 1934 (the forerunner of the present Code section 267(b)(2)) introduced in the House of Representatives, which referred to "more than 50 per centum of the voting stock." However, the bill was amended to its present form by the Senate to correspond with the test adopted by the House for personal holding company status. S. Rept. No. 558, to accompany H.R. 7835, 73d Cong., 2d Sess., p. 27 (1934). The Senate *161 Report stated: Its effect is to disallow a deduction for losses on sales or exchanges of property to corporations by those owning the majority in value of the stock of such corporations, even though actual control may be in a few individuals who own little stock. The House accepted the Senate amendment in conference. H. Rept. No. 1385, 73d Cong., 2d Sess., p. 18 (1934). It is respondent's position that the Laramys owned more than 50 percent in value of the corporation's stock and we agree with respondent's position. We do not consider as controlling herein the fact that the sellers retained title to and possession of the corporation's outstanding stock until the buyers had paid in full the purchase price. The stock purchase agreement (those portions relative to this issue are set out in our findings of fact) vitiates any real authority which the sellers might have retained over the corporation by reason of being shareholders, directors, and officers. A decisive factor tipping the balance of ownership in favor of the individual petitioners' ownership is the fact that Behlmer received all corporate net profits during the years in issue. After the execution of the stock purchase *162 agreement, no amounts could be distributed to the sellers in their capacity as shareholders, officers, or directors of the corporation. Moreover, no amounts were, in fact, distributed to the sellers after said contract's execution. Additionally, Emil Obegi considered that Behlmer took over the business upon execution of the stock purchase agreement. Thus, it would appear that Behlmer alone had the right to the proprietary reward from the corporation's business regardless of how such reward was characterized by the parties. On the basis of the foregoing, we believe that the retention of the corporation's stock by the sellers constituted, in essence, merely a form of security interest and, consequently, that Behlmer owned in excess of 50 percent in value of the outstanding stock of the corporation for purposes of section 267(b)(2). We must now determine whether the amount represented by the note issued May 1, 1959, was actually paid to, or was constructively or otherwise received by, Behlmer in 1959 or at any time within 2 1/2 months thereafter. Section 267(a); Regs. section 1.267(b). It is clear that such amount was not actually paid to Behlmer during the prescribed period. *163 With regard to the question of receipt, constructively or otherwise, the burden is on the corporate petitioner. Although we have earlier held that Behlmer constructively received the notes issued to him by the corporation in 1960 and 1961, that holding was based upon the Laramys' failure to meet their burden of proving that the face amounts of those notes were not constructively received in 1960 and 1961, respectively. On the other side of the coin, the corporate petitioner has failed to prove that the amounts were constructively or otherwise received by Behlmer within the prescribed period. [10] Upon careful scrutiny of the record, there is not sufficient evidence to establish affirmatively that Behlmer constructively or otherwise received the face amount of the 1959 note at any time during the statutory period. Hence, we hold for respondent on this issue under section 267(a)(2) with respect to the note received by Behlmer in 1959. The final issue *164 for our consideration is whether certain deductions for entertainment and automobile expenses are allowable to petitioners in Docket No. 3173-64 in 1959, 1960, and 1961. Respondent's objection to the Laramys' deduction for entertainment expenses is that Behlmer's testimony was vague, general, and uncorroborated by other witnesses or records. Respondent does not deny that such expenditures, if actually incurred, would not be ordinary and necessary business expenses. The issue involves a question of fact which we must determine on the evidence presented. We are convinced by Behlmer's testimony that the claimed entertainment expenses were actually incurred in the amounts testified to by Behlmer. Contrary to respondent's assertion, Behlmer's testimony was neither vague nor general; he testified specifically as to the purpose of entertaining customers, the successful results thereof, and the names of some of the customers so entertained. Although Behlmer's testimony was uncorroborated, his testimony was uncontradicted and we have no reason to disbelieve him. Therefore, we hold that the Laramys are entitled to deduct the amounts claimed for entertainment expenses during 1959, 1960, *165 and 1961. Respondent is on firmer ground in challenging the deductions claimed by the Laramys arising from the use of Behlmer's car in carrying out the corporation's business. Although Behlmer's testimony is clear as to the use to which his car was put, there is nothing in the record to establish the proper amount of the deductions claimed. There is no evidence of the make of the car, its model, year, or cost, or the amounts attributable to repairs or insurance. Thus, we have no basis for ascertaining or even estimating what amount, if any, constitutes a reasonable deduction for automobile expenses. Therefore, we hold for respondent with respect to the automobile expense deduction. Decisions will be entered under Rule 50. Footnotes
1. Respondent has alternatively pleaded an increased deficiency in the additional amount of $3,969.61 for this year in respect to this docket. ↩
2. Respondent has alternatively pleaded an increased deficiency in the amount of $7,699.15 for this year in respect to this docket. However, the alternative argument on which said increased deficiency was based was abandoned by respondent.↩
1. Respondent raised this issue in his amended answer.↩
2. The amount of such notes was to be determined after the end of each fiscal year. The notes were a method devised by Harry E. Barnes to give Behlmer the profits of the corporation.↩
3. The notes herein stated on their face that they were payable "only to" Behlmer D. Laramy. Under California law pertaining to bills and notes, promissory notes which are not denoted as being payable "to bearer" or "to order" of a specified person or entity are not negotiable. California Commercial Code section 3104(d)↩. 4. Respondent does not contest Behlmer's testimony that he received the three notes on or about May 1, 1959, May 1, 1960, and May 1, 1961, respectively, despite the fact that his notice of deficiency states that Behlmer received the first note in 1960 and the second and third in 1961, and the amount of the deficiency in each year (1960 and 1961) is based upon such assumption. On the contrary, respondent accedes to this position (1) by asserting in his requested findings of fact that Behlmer received the three notes in 1959, 1960, and 1961, respectively, and (2) by arguing on brief that each of the three notes constituted income in the years received, namely, 1959, 1960, and 1961. Respondent has not, however, amended his pleadings to conform with such proof.↩
5. These amounts were used to pay the sellers part of the stock purchase price and for Behlmer's personal family expenses.↩
6. Kent v. Lampman, 59 Calif. 407, 139 P. 2d 57↩ (1943). 7. Such a rule might, of course, be inapplicable where (1) notes deferring payments are issued simultaneously with an original contract or (2) other reliable, admissible evidence establishes that the intention of the parties at the time the contract was executed was to defer payment on the notes.↩
8. Behlmer did not establish the total amounts of such withdrawals but merely stated that such sums were used (1) to make payment to the sellers on the purchase price and (2) for his personal family expenses.↩
9. Respondent asserted an increased deficiency against the individual petitioners for that year in the above-said amended answer.↩
10. The corporate petitioner does not contend otherwise, but restricts its argument on this issue to the question of Behlmer's ownership of the corporation during the years in issue.↩