CHARLES L. VAUGHN AND DOROTHY B. VAUGHN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 916–78.    Filed November 30, 1983.

*James H. Morgan, Jr., Rex M. Lamb III*, and *Thomas B. Wells*, for the petitioners.
*Charles B. Hanfman*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioners for 1973 in the amount of $289,338, and an addition to tax under section 6653(a)[1] (negligence, etc.) in the amount of $14,467. After concessions,[2] the issues for decision are (1) whether the sales of an apartment complex and stock by petitioners to petitioner-wife's son were bona fide transactions entitled to recognition for Federal income tax purposes, and (2) whether petitioners are entitled to report these sales using the installment method of reporting income under section 453.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition in the instant case was filed, petitioners Charles L. Vaughn (hereinafter sometimes referred to as Charles) and Dorothy B. Vaughn (hereinafter sometimes referred to as Dorothy), husband and wife, resided in Marietta, Ga.

---

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

[2] On brief, respondent concedes that petitioners are not liable for an addition to tax under sec. 6653(a).

On brief, petitioners concede that, under then-existing law, they were not entitled to recover their attorneys' fee, but they hoped that subsequent judicial or legislative events might alter the law. The law in this regard was not altered judicially (see *Bowen v. Commissioner*, 706 F.2d 1087 (11th Cir. 1983), affg. an unreported order of this Court in connection with this Court's decision based on its opinion at 78 T.C. 55 (1982)). The legislative alteration (sec. 7430, enacted by sec. 292(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 572) applies only to actions commenced after Feb. 28, 1983, and so is not available to petitioners in the instant case even if they otherwise met the requirements of sec. 7430. Respondent's motion for partial summary judgment on the attorneys' fee issue, which was taken under advisement at the trial, is granted.

On June 20, 1963, Perry-Vaughn, Inc. (hereinafter some-times referred to as Perry), was incorporated in Georgia. On or about June 20, 1963, Charles acquired ownership of 50 percent of Perry's issued and outstanding stock. On March 26, 1965, Charles became the owner of 100 percent of Perry's issued and outstanding stock.

In 1963, Perry acquired 20.5 acres of land in Cobb County, Ga. (hereinafter sometimes referred to as the Cobb land). Perry subsequently constructed two apartment complexes, known as the Netherlands I Apartments and Netherlands II Apartments, on approximately 7 acres of this land. In 1963, Perry acquired another tract of land in Cobb County, Ga., on which it constructed an apartment complex consisting of 48 apartment units known as the Riviera Apartments. In 1964, Perry acquired a tract of land in Fulton County, Ga., on which it constructed an apartment complex consisting of 16 apart-ment units known as the Boulevard Apartments. The Riviera and Boulevard Apartments were not located within or adja-cent to the land on which Perry constructed the Netherlands I and Netherlands II Apartments.

In 1967, Perry leased to petitioners 8.6 acres of the Cobb land which was not improved by the construction of the Netherlands I and Netherlands II Apartments (hereinafter sometimes referred to as the leased land). During 1967, petitioners constructed another apartment complex, known as the Netherlands III Apartments, on the leased land. There were then three apartment complexes adjacent to each other known as the Netherlands I, Netherlands II, and Netherlands III Apartments (hereinafter sometimes referred to collectively as the Netherlands apartments), consisting of 52, 78, and 126 apartment units, respectively. Petitioners operated the Neth-erlands III Apartments through a two-member partnership known as Netherlands III Apartments (hereinafter sometimes referred to as the Netherlands partnership) in which each petitioner owned an equal interest in the capital and profits. Petitioners lived in and managed the Netherlands apartments from the time the Netherlands I Apartments were built in 1964 until some time in 1973.

In 1971, petitioners' certified public accountant began to advise them that Perry had or would soon have an unreason-able accumulation of earnings. He also advised Charles that

the tax advantage and the tax sheltering effect of the apartment ownership had been fully utilized and that continued ownership of the Netherlands III Apartments and Perry stock would create more taxable income than cash flow. Because of these factors, he advised Charles to consider, among several alternatives, selling the Netherlands III Apartments and Perry stock.

By 1972, Charles had turned all his attention to the development of a major office park project in the Atlanta metropolitan area known as Circle 75. Because of Charles' involvement in Circle 75, all or most of the management responsibilities for the Netherlands apartments, the Boulevard Apartments, and the Riviera Apartments fell upon Dorothy's shoulders. Charles realized that the management problems were too much for her to handle alone. Because of this strain on Dorothy, petitioners' marriage was adversely affected and Charles realized that the sale of the Netherlands partnership and the Perry stock and the resulting relief from the burdens of apartment management would have a favorable impact upon his marriage. Because the Circle 75 project involved certain risks, Charles also saw the sale of the Netherlands partnership and the Perry stock as a means of providing steady income and security to him.

When petitioners married each other in 1953, Dorothy had custody of a son from a previous marriage, which had ended in 1951. The son, born in 1947, was named Steven W. Rogers. When he was enrolled in military school as a young boy, he began to use the name Steven W. Vaughn. (This son is hereinafter sometimes referred to as Steven.) Charles did not adopt Steven. Petitioners have a daughter of their marriage, Valerie G. Vaughn (hereinafter sometimes referred to as Valerie), who was born in 1955.

Steven lived with petitioners from the date of petitioners' marriage until he entered college at the University of Georgia in 1965. Steven then lived with petitioners during the summer of 1966 through 1968. He worked for Perry during the summers of 1965, 1966, 1967, and 1968. In August 1968, Steven got married. He served on active duty with the U.S. Marine Corps. After Steven returned from this active duty in August 1969, he and his wife lived in Atlanta, Ga., he was employed full time by Perry, and he attended Georgia State University.

In December 1972, Steven received a B.A. degree in business administration with a major in real estate.

While Steven was employed by Perry, he participated in the construction of the Netherlands apartments, did landscaping work, acted as assistant to the construction superintendent, had payroll duties, and later had management responsibilities. Since October 1972, Steven owned and lived in a house in Marietta, Ga., which is approximately a 15-minute drive from the Netherlands apartments. Between 1970 and 1973, Steven's gross income from his employment by Perry ranged between $15,000 and $25,000 per year.

In the summer of 1972, Steven and petitioners began discussing the transfer to Steven of the Netherlands partnership and the Perry stock. Petitioners reached a general agreement with Steven in October 1972 whereby petitioners would transfer the Netherlands partnership to Steven, and Charles would transfer Perry stock to Steven, but they had not agreed to a price at that time. Shortly before December 22, 1972, petitioners and Steven agreed to a price for the Netherlands partnership and the Perry stock. Although the agreement to transfer was consummated in three separate portions (a Dec. 22, 1972, transfer of Charles' interest in the Netherlands partnership, a Jan. 29, 1973, transfer of Dorothy's interest in the Netherlands partnership, and a Feb. 2, 1973, transfer of the Perry stock), it was negotiated and agreed to as a single package.

On December 22, 1972, Charles transferred his one-half undivided interest in the Netherlands partnership to Steven pursuant to a contract styled "Installment Sales Contract" (hereinafter sometimes referred to as contract I). Pursuant to contract I, Steven gave Charles a promissory note dated December 22, 1972, and styled "Installment Note" (hereinafter sometimes referred to as note I) in the principal amount of $150,000 (with interest at 5 percent per year). Steven also assumed one-half of the then-outstanding liabilities of the Netherlands partnership. Note I required 240 monthly payments of $989.93 (of which $625 was to be principal and $364.93 was to be interest), beginning January 5, 1973. Payment on note I was secured by the property transferred. The liabilities thus assumed amounted to $655,927.

Contract I provides, in relevant part, as follows:

2. PURCHASE. * * * The payment of said installment note shall be secured by a security interest in the Property and in the net proceeds of the sale of the Property, in the event of its disposal, given by the Purchaser [Steven] to the Seller [Charles], which security interest shall originally be a Deed to Secure Debt and a Financing Statement and, if the Property is disposed of by the Purchaser and the Seller releases his security interest in the property, the Seller's security interest in the net proceeds of sale shall be in a form and in a manner substantially in keeping with the security interest which would be required by a commercial bank in Atlanta, Georgia, under similar circumstances.

On January 29, 1983, Dorothy transferred her one-half undivided interest in the Netherlands partnership to Steven pursuant to a contract styled "Installment Sales Contract" (hereinafter sometimes referred to as contract II). Pursuant to contract II, Steven gave Dorothy a promissory note dated January 29, 1973, and styled "Installment Note" (hereinafter sometimes referred to as note II) in the principal amount of $150,000 (with interest at 5 percent per year). Steven also assumed one-half of the then-outstanding liabilities of the Netherlands partnership. Note II required 240 monthly payments of $989.93 (of which $625 was to be principal and $364.93 was to be interest), beginning March 1, 1973. Payment on note II was secured by the property transferred. The obligations thus assumed amounted to $599,835.

Contract II provides, in relevant part, as follows:

2. PURCHASE. * * * The payment of said installment note shall be secured by a security interest in the Property and in the net proceeds of the sale of the Property, in the event of its disposal, given by the Purchaser [Steven] to the Seller [Dorothy], which security interest shall originally be a Deed to Secure Debt and a Financing Statement and, if the Property is disposed of by the Purchaser and the Seller releases his security interest in the property, the Seller's security interest in the net proceeds of sale shall be in a form and in a manner substantially in keeping with the security interest which would be required by a commercial bank in Atlanta, Georgia, under similar circumstances.

On or about February 2, 1973,[3] Charles transferred all of the outstanding shares of stock in Perry to Steven pursuant to a contract styled "Installment Sales Contract" (hereinafter sometimes referred to as contract III). Pursuant to contract III,

---

[3]So stipulated. Contract III is dated Jan. 29, 1973; both Charles' and Steven's signatures in contract III are dated Feb. 16, 1973.

Steven gave Charles a promissory note dated February 2, 1973, and styled "Installment Note" (hereinafter sometimes referred to as note III) in the principal amount of $660,000 (with interest at 5 percent per year). Note III required 240 monthly payments of $4,355.70 (of which $2,750 was to be principal and $1,605.70 was to be interest), beginning April 1, 1973. Payment on note III was secured by the stock transferred.

Contract III provides, in relevant part, as follows:

2. PURCHASE. * * * Should PERRY-VAUGHN, INC. be liquidated by the stockholders, the security interest of the Seller [Charles] in the stock transferred pursuant hereto shall attach to the net liquidating distribution or distributions, from time to time made to the stockholders of PERRY-VAUGHN, INC., and should any such liquidating distributions be in the form of cash the Purchaser [Steven] shall be obligated to transfer such cash liquidating distributions in escrow in a form and manner substantially in accordance with Exhibit "B" and in an amount equal to the lesser of the cash liquidating distribution or one hundred percent (100%) of the then outstanding balance of said installment note plus the outstanding balances of the two installment notes attached hereto as Exhibits "C" and "D" and should such liquidating distribution be in kind, the Purchaser shall be obligated, upon the sale, from time to time, of any such liquidating distribution or distributions to transfer the net proceeds of such sale or sales in escrow in a form and manner substantially in accordance with Exhibit "B" in an amount equal to the lesser of each such sales proceeds or one hundred percent (100%) of the then outstanding balance of said installment note plus the outstanding balances of the two installment notes attached hereto as Exhibits "C" and "D".

The installment notes referred to as Exhibits "C" and "D" in contract III are notes I and II. Exhibit "B" of contract III is an unexecuted document styled "Escrow Agreement" (hereinafter sometimes referred to as the escrow agreement), which provides for a systematic withdrawal plan whereby an escrow agent would make payments to Charles to discharge Steven's obligation under note III.

The escrow agreement provides, in relevant part, as follows:

### ESCROW AGREEMENT

It is hereby agreed as follows, as of this __day of __, 1973, between CHARLES L. VAUGHN (hereinafter referred to as the "Seller"), STEVEN W. VAUGHN (hereinafter referred to as the "Purchaser"), and _____ (hereinafter referred to as the "Escrow Agent"):

This Escrow Agreement is made between the parties hereto to carry out the provisions of an Installment Sales Contract and an Installment Note dated the 29th day of January, 1973, [contract III and note III] between the Seller and the Purchaser.

For the purposes of this Escrow Agreement, the following terms shall have the following meanings:

| | |
|---|---|
| *Systematic Withdrawal Plan*: | A program whereunder shares of a regulated investment company or shares of corporate stocks or bonds, the "Fund", are registered in the name of the Escrow Agent providing for shares to be redeemed periodically from which payments are to be made to the Seller. |
| *Escrow Agent*: | (The name of the Escrow Agent) |
| *Fund*: | (The name of the shares or bonds) |

The Purchaser has transferred shares of the Fund to the Escrow Agent with the understanding that the Escrow Agent will establish a Systematic Withdrawal Plan in order to facilitate the discharge of Purchaser's obligation to Seller under the Installment Sales Contract and Installment Note. Escrow Agent agrees that the Fund shares under the Systematic Withdrawal Plan shall be held by it only in escrow without any rights provided the Seller in the Fund shares, subject to the following provisions:

(1) *Payments*. Payments shall be made to the Seller under the Systematic Withdrawal Plan from and to the extent of the Fund shares at the rate provided in the Installment Note. Payments shall not be increased or decreased and no Fund shares or cash held in the Systematic Withdrawal Plan shall be withdrawn or liquidated except to make the payments stipulated in the Installment Note or to reimburse the Escrow Agent for its agreed fee. However, in addition to any payments required under such Installment Sales Contract and Installment Note, the Purchaser may at his option make payments to the Seller in addition to the payments made through the Systematic Withdrawal Plan which shall, during any twelve months period, not exceed thirty percent (30%) of the unpaid balance of the purchase price. Notice of each such additional payment shall be given to the Escrow Agent within thirty (30) days of making such payment.

(2) *Purchaser's Right to Use Assets*. Should the value of the assets held by the Escrow Agent exceed the adequate value of Collateral Security, the Purchaser may request of the Escrow Agent, and the Escrow Agent shall release to the Purchaser, shares representing the excess values. The adequate value of Collateral Security shall be considered to be 110% of the unpaid balance of said Installment Note.

(3) *Default*. If the Purchaser defaults in any of his obligations under the Installment Sales Contract or Installment Note and the Seller declares the entire amount or any portion of the obligation due and payable, or for any other reason all or any part of said obligation becomes due and payable, the Seller shall give written demand to the Escrow Agent and shall, subject to the following, have the right to have all or such portion of the Fund shares and cash then held by or for the account of the Escrow Agent, in an amount necessary to discharge the obligation or such part thereof as is then due and payable, delivered to the Seller. The Escrow Agent shall, at the end of thirty (30) days after receipt of the written demand from the Seller, and evidence

that notice of such written demand has been given to the Purchaser, assign and deliver to the Seller the appropriate value of Fund shares. If prior to the expiration of such thirty (30) day period the Purchaser shall demand in writing that the Escrow Agent withhold the delivery of such Fund shares and cash, then the Escrow Agent shall not make such delivery until the controversy with respect thereto shall have been settled by an agreement between the Seller and the Purchaser or by a final judgment of a court of competent jurisdiction.

Upon written notification by the Seller to the Escrow Agent that the installment obligation then due and payable has been paid in full or that the Purchaser has otherwise settled the indebtedness or if the assets in Escrow have been exhausted, the Escrow Agent shall assign to the Purchaser any remaining shares, whereupon the Systematic Withdrawal Plan and Escrow Agreement will be terminated.

(4) *Voting Rights.* So long as the Purchaser is not in default under the terms of the Installment Sale Contract and Installment Note, he shall have the right to vote the Fund shares and the Escrow Agent shall execute and transmit appropriate proxies to him.

(5) *Assignment.* The Purchaser and/or the Seller may assign either of their rights hereunder, and the Escrow Agent shall act accordingly upon receipt of appropriate written instructions signed by the party making the assignment.

## Note III provides, in relevant part, as follows:

Notwithstanding any provision contained in this instrument to the contrary, in the event of a default under the terms hereof, there shall be no personal liability on the part of the maker hereof [Steven] and the holder hereof [Charles] shall look only to the collateral securing this indebtedness for payment and satisfaction of the indebtedness evidenced hereby.

Steven was not represented by counsel during these three transactions.

By agreement dated February 2, 1973, and styled "Option Agreement" (hereinafter sometimes referred to as the option), Steven granted Valerie an option, exercisable within 360 days, by which she had the right to obtain one-half of the assets transferred to Steven by petitioners pursuant to contracts I, II, and III on condition that she assume one-half of the liabilities on notes I, II, and III.

The option does not require Valerie to assume any part of the $655,927 or $599,835 liabilities assumed by Steven on the Netherlands partnership transfers from Charles or Dorothy, respectively.

The option provides, in relevant part, as follows:

4. * *. * If the Netherlands III Apartments or any part thereof is sold by the Seller [Steven] or if said stock [in Perry] is sold by the Seller or if the

Seller has received a cash liquidating distribution from PERRY-VAUGHN, INC., during the term of this option agreement, he agrees to transfer the net proceeds, after the payment of income taxes, resulting from such sale of The Netherlands III or such stock, or the net cash liquidating distribution, after the payment of income taxes, as the case may be and after the escrow account is fully funded, to himself as Trustee to be held in a trust substantially in accordance with the provisions of Exhibit "A" hereof. If the Purchaser [Valerie] exercises her option hereunder, she shall be entitled to a one-half (½) undivided interest in the net assets of said trust and shall become a beneficiary thereof. If the Seller receives a liquidating distribution in kind, from PERRY-VAUGHN, INC., and holds such property in kind at the time such option is exercised by the Purchaser, the Purchaser shall be entitled to an undivided one-half (½) interest in said liquidating distribution, provided, however, that the Seller shall have the right at any time during which this option remains unexercised, to sell any such in kind liquidating distribution upon such terms and conditions as he deems appropriate, in which event he is required pursuant to said Installment Sales Contracts [contract I, contract II, and contract III] to transfer to the escrow agent an amount equal to the lesser of the net sales proceeds or one hundred (100%) percent of the then outstanding balance of said Installment Notes, and the Seller agrees to transfer into the trust agreement as defined above the balance of such net sales proceeds.

By an untitled document dated February 2, 1973, Steven entered into a trust agreement (hereinafter sometimes referred to as the trust agreement) which purported to create a trust (hereinafter sometimes referred to as the trust) with himself as trustee, and himself and Valerie as beneficiaries. Steven obligated himself to transfer to the trust:

All of that property required to be distributed to this trust by STEVEN W. VAUGHN pursuant to the provisions of the option agreement between STEVEN W. VAUGHN and VALERIE G. VAUGHN of even date.

The trust agreement provides that if Valerie were to exercise her rights under the option, then one-half the trust assets would be held for Valerie and one-half for Steven. The trust assets would then be distributed one-half to Steven 360 days after February 2, 1973, and one-half to Valerie when she reaches age 25. If Valerie were not to exercise her rights under the option, then the assets would all be distributed to Steven. The trust provides, in relevant part, as follows:

ITEM VII.

\*     \*     \*     \*     \*     \*     \*

Any other provision of this trust agreement to the contrary notwithstanding, CHARLES L. VAUGHN shall have the power by instrument in writing

and delivered to the Trustee to remove the Trustee from office and to appoint a successor trustee which may be an individual or a bank or trust company authorized to perform trust functions and having a combined capital and surplus of not less than Ten Million ($10,000,000.00) dollars to serve as successor trustee hereunder, provided, however, that he shall not have the authority to appoint himself as such successor trustee.

Valerie was a minor when the option and the trust agreement were executed.

On February 4, 1973, Charles resigned as president and Dorothy as secretary-treasurer of Perry, and Steven was elected president of Perry. On February 5, 1973, Perry adopted a plan of liquidation under section 337. On May 7, 1973, the Netherlands I and II Apartments and the Cobb land (including the leased land) were transferred from Perry to Steven pursuant to the plan of liquidation.

In December 1972 or January 1973, Steven began negotiating with Robert M. Krasnoff (hereinafter sometimes referred to as Krasnoff) and three real estate agents concerning the possible sale of the Netherlands apartments. Steven, with the help of Dorothy, provided Krasnoff with financial information concerning the past operations of the Netherlands apartments. At a meeting held on or before January 11, 1973, a tentative agreement was reached between Steven and Krasnoff concerning the sale of the Netherlands apartments to Krasnoff. At this meeting, Krasnoff accepted Steven's proposed sale price of $700,000 cash plus the assumption of existing mortgages. Before January 26, 1973, Steven reviewed a draft contract for the sale of the Netherlands apartments and recommended certain changes in the draft contract.

On March 7, 1973, a contract (hereinafter sometimes referred to as the contract) was entered into whereby Steven agreed to sell, and Krasnoff to buy, the Netherlands apartments and most of the Cobb land (including the leased land) (hereinafter sometimes referred to as the underlying land). The contract provides that Krasnoff would assume three outstanding promissory notes secured by the property. Krasnoff did not agree to assume Steven's obligations on notes I, II, and III. In addition, Krasnoff agreed to assume a $850,000 loan that Steven agreed to obtain from Scott Hudgens Realty & Mortgage, Inc., of which $810,000 was to be kept by Steven as part of the purchase price and the remaining $40,000 of which was to be transferred by Steven to Krasnoff at the time of

closing. Steven had applied for this loan by document dated March 1, 1973.

The contract provides in relevant part as follows:

3. *Warranties and Representations.* Seller [Steven] does hereby warrant and represent to, and covenant and agree with, Purchaser [Krasnoff] as follows:

(a) That Seller is the owner of good and marketable fee simple title to the Property, free and clear of all liens, restrictions and encumbrances, except only those * * * items set forth on Exhibit "D", attached hereto and by references made a part hereof;

(b) That Seller is the owner of good and marketable title to the Personalty, free and clear of all liens, restrictions and encumbrances, except only those items set forth on the said Exhibit "D";

Exhibit "D" of the contract did not list the security interests retained by Charles and Dorothy pursuant to contracts I, II, and III.

On May 31, 1973, the purchase and sale of the Netherlands apartments and the underlying land was closed. Title was taken in the name of the Netherlands, Ltd., a Georgia limited partnership whose general partners were Krasnoff and Leslie H. Bick. Steven received $742,849.50 (hereinafter sometimes referred to as the proceeds), the balance of the purchase price owed to him. On or about May 31, 1973, Dorothy and Charles executed quitclaim deeds to any right, title, security interest, or any other interest which they had in the Netherlands III Apartments and the leased land.

On January 11, 1974, the final liquidating distribution of the assets of Perry was completed, at which time the Boulevard Apartments, the Riviera Apartments, two notes receivable from Charles, cash, and other assets were distributed to Steven. Steven assumed various liabilities of Perry.

On February 1, 1974, Valerie exercised her rights under the option. A document dated February 1, 1974, provides, in relevant part, as follows:

FOR VALUE RECEIVED, Steven W. Vaughn has this day transferred, sold, assigned, conveyed and set over to Valerie G. Vaughn, as Assignee, her successors, representatives and assigns, a one-half (½) undivided interest in all his right, title and interest in and to those funds held in escrow under the terms and conditions of [contracts I, II, and III].

    *      *      *      *      *      *      *

As a part of the consideration for this conveyance, Assignee herein assumes and agrees to pay one-half (½) of the present outstanding indebt-

edness on * * * [notes I, II, and III] secured by the above referred to escrowed funds * * *

On February 1, 1974, Steven transferred to Valerie one-half of all the assets received by him as a liquidating distribution from Perry on January 11, 1974. Valerie assumed one-half of the liabilities that Steven had assumed under the plan of liquidation.

On November 4, 1975, the Riviera Apartments were sold to Thomas K. Fitzpatrick and on October 1, 1976, the Boulevard Apartments were sold to Virginia M. Everett. Steven and Valerie then continued to own some of the Perry assets.

Steven did not place the proceeds attributable to the sale of the property received as a liquidating distribution from Perry in escrow as provided for in contract III, nor were the remaining proceeds placed in trust pursuant to the trust agreement. Until December 2, 1975, most of the proceeds were invested in commercial paper, U.S. Treasury notes, savings accounts, preferred stocks, and corporate bonds. Steven earned $13,863.90 from these investments in 1973, $91,934.64 in 1974, and $62,223.22 in 1975.

With a few exceptions, each installment called for under notes I, II, and III was paid timely and in full through January 1977. Notes I, II, and III were paid in full in March 1977.

When the Netherlands partnership and Perry stock were sold to Steven by petitioners, the parties anticipated that Steven would derive sufficient cash flow through his ownership of those assets to satisfy the installment payments required by notes I, II, and III. From the dates of the sales until May 31, 1973, the payments on notes I, II, and III were made out of the cash flow derived from the Netherlands apartments, the remaining Perry assets, and cash that had been held by Perry. After May 31, 1973, the payments on notes I, II, and III were made from the proceeds, the income derived from investing the proceeds, and from cash flow derived from the remaining Perry assets.

Neither of the petitioners engaged in any negotiations with Krasnoff or the real estate agents relating to the sale of the Netherlands apartments. Krasnoff and the real estate agents each believed Steven to be the owner and seller of the Netherlands apartments.

Petitioners used the cash receipts and disbursements method of accounting during 1972 and 1973.

Petitioners elected on their joint individual income tax return for 1972 to report the income from the sale of Charles' one-half undivided interest in the Netherlands partnership pursuant to the installment method under section 453. Petitioners elected on their joint individual income tax return for 1973 to report the sale of Dorothy's one-half undivided interest in the Netherlands partnership and the sale of Charles' stock in Perry pursuant to the installment method under section 453.

———

The escrow agreement did not impose any restrictions on Charles' right to receive installment payments on note III, except the passage of time.

Charles anticipated that, if Perry were liquidated and its assets sold, then Steven's installment payments would be made out of the proceeds of the sale of the Perry assets.

## OPINION

Petitioners contend that during 1972 and 1973 they made three valid installment sales to Steven, and that they are entitled to report the gains from these sales on the installment basis pursuant to section 453. Respondent contends that the sales by petitioners to Steven were without substance and that petitioners retained complete control over the proceeds of the sale of the Netherlands apartments and the underlying land to the Netherlands, Ltd. Therefore, respondent concludes, petitioners' sales to Steven should be disregarded, Charles should be regarded as receiving a liquidating distribution from Perry of the Netherlands I and II Apartments and the Cobb land, and petitioners should be regarded as having made the sale of the Netherlands Apartments and the underlying land directly to the Netherlands, Ltd.

We do not fully agree with either side.

The general rule is that the entire amount of gain from the sale of property is taxed to the seller in the year of the sale. As

an exception to this rule, in certain circumstances, section 453[4] provides that in the case of an installment sale, income need not be reported until "actually received." Also, the amount to be reported in any one year is the proportion of the installment payments received that year, that the gross profit bears to the total contract price.

The installment basis of reporting was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price. Another reason was the difficult and time-consuming effort of appraising the uncertain market value of installment obligations. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948). Since section 453 is an exception to the general rule as to the year of

---

[4] Sec. 453 provides, in relevant part, as follows:

SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY. —

(1) IN GENERAL.— Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

\* \* \* \* \* \* \*

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY. —

(1) GENERAL RULE.—Income from —

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply —

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of sale or other disposition —

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

The revision of the foregoing provisions by sec. 2(a) of the Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247, does not apply to the years in issue; the amendments by secs. 1906(b)(13) [sic] (A) and 1951(b)(7)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1834, 1838, also do not apply to the years in issue. In particular, we do not dwell on the implications of the enactment of the intrafamily sales rules of present sec. 453(e), because the Congress has instructed us that "no inference [is to] be drawn from these provisions as to the proper treatment of any related party installment sale occurring prior to the effective date provided under the bill [May 14, 1980]." H. Rept. 96–1042, at 15 (1980); S. Rept. 96–1000, at 17 (1980), 1980–2 C.B. 494, 503.

reporting income, it is to be construed narrowly. *Pozzi v. Commissioner*, 49 T.C. 119, 127 (1967). See *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 51–52 (1955). Also, section 453 does not apply if the taxpayer has entered into an arrangement which is in form but not in substance a true installment sale. *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Lustgarten v. Commissioner*, 639 F.2d 1208 (5th Cir. 1981), affg. 71 T.C. 303 (1978).

In the instant case, we are asked once again to determine whether the "substance over form" doctrine should be applied to an intrafamily sale so as to bar petitioners from claiming section 453 installment sales treatment.

Petitioners have the burden of proving that they qualify for the benefits of section 453. *Wrenn v. Commissioner*, 67 T.C. 576, 582 (1976); see *Bowen v. Commissioner*, 78 T.C. 55, 78 (1982). A determination of the existence or nonexistence of sales by petitioners to Steven, rather than sales by petitioners to the Netherlands, Ltd., must be based on all of the facts and circumstances. *Bowen v. Commissioner*, 78 T.C. at 78; *Wrenn v. Commissioner*, 67 T.C. at 584. "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 456 (1950).

In testing the reality of sales transactions, sales between family members are to be scrutinized with greater skepticism than sales between unrelated parties.[5] *Bowen v. Commissioner*, 78 T.C. at 78; *Wrenn v. Commissioner*, 67 T.C. at 584. This is because of the greater potential for complicity between related parties in arranging their affairs in a manner devoid of legitimate motivations. *Bowen v. Commissioner*, 78 T.C. at 78.

The courts have applied these general principles to intrafamily installment sales in a number of cases. A leading case with which we begin our analysis is *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969). In

[5]Although it appears that Steven is not legally related to Charles, it is also clear from the record that there is a close personal relationship between the two, such that Charles and Steven treat each other as would a father and son. Under these circumstances, we will scrutinize the sale between Charles and Steven as closely as we would any true intrafamily sale. This Court's conclusion, in any event, is not at all dependent on the formal legal relationship between Charles and Steven.

*Rushing*, two taxpayers each owned 50 percent of the stock of two corporations. Shortly after the adoption by both corporations of plans of liquidation, substantially all of the corporate assets of both corporations were sold in transactions that were nontaxable to the corporations under section 337(a). Each of the taxpayers then created irrevocable trusts for each of his children and sold his stock in the two corporations to these trusts in installment transactions. Shortly thereafter, the trustee of the trusts—a bank ("an independent corporate trustee" (52 T.C. at 898))—liquidated the two corporations and collected the distribution proceeds. The issue was whether the taxpayers could use the installment method under section 453 to report the gain from the stock sales or whether all gain had to be reported by the taxpayers in the year in which the trusts received the distribution proceeds. The Court of Appeals set forth its analysis as follows (441 F.2d at 598):

We think it clear from a reading of these cases that a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax. * * * On the other hand, a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom. * * *

Under this test, the trusts were held to be autonomous entities that were not under the control of the selling taxpayers, so that the taxpayers retained no effective benefit or control over the liquidation dividend. Thus, installment sale treatment was held to be proper.

In *Nye v. United States*, 407 F. Supp. 1345 (M.D. N.C. 1975), a husband bought securities from his wife on the installment basis and then resold them. Husband and wife each maintained substantial separate personal estates. Applying the *Rushing* control test, the court found that the wife did not directly or indirectly possess control over the resale proceeds or over the economic benefits therefrom. Absent such control, the court found that the marriage relationship alone was insufficient grounds for denying the wife the benefits of reporting her gain under the installment method.

In *Wrenn v. Commissioner, supra,* a wife bought securities from her husband on the installment basis and then resold them. She then purchased shares in a mutual fund specified by her husband, in an amount equal to the proceeds of the sale of the securities, in order to satisfy a security obligation arising out of the original installment purchase from her husband. In analyzing *Nye v. Commissioner, supra,* this Court noted that in *Nye* each party had separate and distinct purposes for entering into the installment sales agreement. *Wrenn v. Commissioner,* 67 T.C. at 583. This Court determined that the installment sale in *Wrenn* was not bona fide in nature because neither husband nor wife had any independent purpose of a business or personal nature, other than tax avoidance, for entering into the sale. 67 T.C. at 584. Thus, this Court added an independent purpose test to the *Rushing* control test in judging intrafamily installment sales.

*Lustgarten v. Commissioner, supra,* brings another factor into play. In *Lustgarten,* a son bought stock from his father under an installment contract. At the same time, the son executed a note and an escrow agreement. Cash dividends had never been paid on the stock, and the son did not have sufficient liquid assets to make the installment payments. The escrow agreement required the son to sell the stock and invest the proceeds in a mutual fund named in the installment contract, and to place these mutual fund shares in escrow. The son sold the stock, bought the mutual fund shares, and placed the latter shares in escrow. The son testified that in an emergency he would convey the shares remaining in escrow to his father. This Court stated as follows (71 T.C. at 309–310):

Petitioner has made an attempt to align himself with the cases emanating from *Rushing.* For reasons which will become apparent, we do not believe that the *Rushing* result pertains herein. For example, petitioner has overlooked a second line of cases wherein an escrow account was used to secure the sellers receipt of the installment payments. This line of cases is exemplified by *Pozzi v. Commissioner,* 49 T.C. 119 (1967), wherein this Court found an installment sale of property secured by funds placed in escrow resulted in the constructive receipt of the entire purchase price in the year of sale which disqualified him from the use of section 453 reporting. A constructive receipt of the purchase price would cause the taxpayer to fail the *Rushing* test because of his control over the proceeds of the sale.

This Court held that the son could not act as a free agent, and the escrow agreement was evidence of petitioner's retention of

control over the proceeds of the resale. This Court concluded that the taxpayer was not entitled to use the installment method of reporting income from the sale to the son because of the taxpayer's constructive receipt of the entire proceeds of the resale of the stock "arising out of his use of his son as his agent to make the sale and his beneficial use of an escrow account." *Lustgarten v. Commissioner*, 71 T.C. at 311.

On appeal, the Court of Appeals for the Fifth Circuit distinguished *Rushing v. Commissioner, supra*, as follows (639 F.2d at 1211):

the taxpayer in * * * [*Rushing*] was unable to require or prevent the trustee's sale of the stock or to control any subsequent reinvestment. Moreover, there was no possibility that the taxpayer [in *Rushing*] could immediately realize the full benefit from the sale of the stock, because the proceeds were placed in an irrevocable trust. Such a possibility exists when, as here, the proceeds are deposited in an escrow account terminable by agreement of the parties. * * *

The Court of Appeals concluded that the taxpayer in *Lustgarten* was not entitled to installment sale treatment because he had constructive receipt of the proceeds from the resale of the stock by his son.

In *Bowen v. Commissioner, supra*, a husband bought stock from his wife. More than a year later, the husband resold the stock to a third party. This Court upheld the wife's right to use installment sale treatment, under the following reasoning (78 T.C. at 81):

the facts sufficiently establish that Mr. and Mrs. Bowen were independent economic entities for purposes of the interspousal stock sale. By selling her stock, Mrs. Bowen surrendered her control over that stock and over the economic benefits derived therefrom. To conclude otherwise would require us to find that Mr. Bowen was subservient to his wife's desires with respect to the stock. The facts do not support such a finding.

In testing the substance of the sales between Charles and Steven, and Dorothy and Steven, we believe that the transfers are subject to the *Rushing* control test, as amplified in *Wrenn v. Commissioner, supra*, and *Lustgarten v. Commissioner, supra*. Respondent concedes that petitioners had business and personal reasons for making the three sales to Steven. Steven also had valid business and personal reasons for entering into the sales; viz, the opportunity to profit from the investment of funds obtained at a relatively low interest rate and repayable

over a long period of years, and the opportunity to profit from any appreciation in the assets he held. Thus, the independent purpose test of *Wrenn* is satisfied.

It appears clear from the record in the instant case that petitioners' sales to Steven and Steven's subsequent resale were not part of a prearranged plan. Steven negotiated the sale of the Netherlands apartments and the underlying land directly with Krasnoff. Steven did not reach a final agreement with Krasnoff until March 7, 1973, more than a month after the last of petitioners' sales to him. Although petitioners must have known, before any of the sales to Steven, that Steven was negotiating in an attempt to resell the Netherlands apartments and the underlying land, the mere fact that an installment purchaser makes it known to the installment seller that the purchaser plans to resell at some future date does not by itself disqualify the seller from reporting gain under section 453. *Nye v. United States*, 407 F. Supp. at 1350.

The facts in the instant case lead us to conclude that petitioners, on the one hand, and Steven, on the other hand, were independent economic entities. By selling the Perry stock and the Netherlands partnership to Steven (apart from the escrow agreement, discussed *infra*), petitioners surrendered complete control over these properties and over the economic benefits derived therefrom. Steven was able to exercise independent control over the use of the properties and over the resale to Krasnoff. Further, Steven and Valerie retained ownership of the remaining Perry assets for some years after the sale of the Perry stock to Steven. They held the Riviera Apartments until November 1975 and the Boulevard Apartments until October 1976. Steven's uncontroverted testimony indicates that he and Valerie continued to hold some of the Perry assets for several years after the Boulevard Apartments sale.

It does not appear that Steven had sufficient assets, independent of the Netherlands partnership and the Perry stock, with which to purchase these assets on the installment (or any other) basis. However, the instant case is distinguishable from *Lustgarten v. Commissioner, supra*, where a resale of the stock was mandated by the fact that no cash dividends were ever paid on the stock. In the instant case, it is clear that Steven could derive substantial cash flow through his ownership of

the Netherlands partnership and Perry stock, which could be used to help satisfy his obligations under contract I, contract II, and contract III.

We conclude that the form of the three transfers to Steven reflect the substance of the transactions, and that these transfers constituted bona fide sales to Steven. We also conclude that Steven (and not Charles as respondent contends) received the liquidating distribution from Perry. However, we must still consider what effect the escrow agreement has on these transactions.

Escrow agreements have often resulted in the denial to taxpayers of the right to use the installment method of reporting. *Trivett v. Commissioner*, 611 F.2d 655 (6th Cir. 1979), affg. a Memorandum Opinion of this Court;[6] *Williams v. United States*, 219 F.2d 523 (5th Cir. 1955); *Oden v. Commissioner*, 56 T.C. 569 (1971); *Pozzi v. Commissioner, supra*. The payment of funds by a purchaser into an escrow account results in the constructive receipt of such funds by the seller if (1) the funds are not subject to substantial conditions or limitations other than time of payment, and (2) the seller expects to collect from the funds placed in escrow. *Griffith v. Commissioner*, 73 T.C. 933, 943 (1980); *Oden v. Commissioner*, 56 T.C. at 576–577. Cf. *Stiles v. Commissioner*, 69 T.C. 558, 564– 566, 569 (1978).

In the instant case, the escrow agreement is an integral part of contract III. Contract III provides for a transfer of the proceeds from the sale of the liquidated assets of Perry to an escrow agent. The escrowed funds must be invested in shares of a regulated investment corporation, or shares of corporate stocks or bonds. Under the escrow agreement, the funds held in escrow are not subject to any substantial conditions or limitations other than time of payment.

The escrow agreement provides that the payments under note III are to be made directly from the escrow funds. While the escrow agreement would not preclude Charles from asking Steven for the payments, Steven was not personally liable on note III. In addition, the record indicates that a substantial portion of the money used by Steven to make the payments on

---

[6] T.C. Memo. 1977–161.

notes I, II, and III was derived from his investment of the proceeds. If Charles had enforced the escrow agreement and forced Steven to transfer the proceeds of the sale of Perry stock into escrow, it appears clear that Steven would not have had sufficient separate income to satisfy his obligations on notes I, II, and III. Consequently, if Charles had enforced the escrow agreement, then he would have had to look to the escrow funds to collect the payments on note III.

We conclude that the control that contract III gave Charles over the proceeds attributable to the resale of the liquidated Perry assets resulted in his constructive receipt of these proceeds during 1973. *Lustgarten v. Commissioner, supra.* However, the escrow agreement did not apply to the proceeds attributable to the resale of the Netherlands partnership assets, and we do not conclude that there was a similar 1973 constructive receipt of the proceeds of the resale of the Netherlands partnership assets.

The fact that Charles chose not to enforce the escrow provisions of contract III does not affect this conclusion. "The doctrine of constructive receipt is well established * * * , and is to the effect that income which is unqualifiedly available and subject to the demand of a cash basis taxpayer is treated as having been received at the time it became so available regardless of the time of actual receipt." *Romine v. Commissioner,* 25 T.C. 859, 873 (1956). See *Blyler v. Commissioner,* 67 T.C. 878, 884 (1977); sec. 1.451–2, Income Tax Regs. In discussing the constructive receipt doctrine, it has been said that a "taxpayer's own choice to leave untouched money or property which is otherwise subject to his call does not ordinarily defer the receipt of income." *Denver & Rio Grande Western Railroad Co. v. United States,* 162 Ct. Cl. 1, 7, 318 F.2d 922, 925 (1963). Similarly, a "taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." *Hamilton Nat. Bank of Chattanooga, Administrator v. Commissioner,* 29 B.T.A. 63, 67 (1933). See 2 J. Mertens, Law of Federal Income Taxation, sec. 10.06, at 25 (1974 rev.).

Under the constructive receipt doctrine, it is the existence of Charles' power to enforce the escrow provisions of contract III and thereby assert control over the Perry asset proceeds, rather than the actual exercise of such control, which is

determinative here. Of course, as long as Steven invested the proceeds in a manner acceptable to Charles, Charles had no reason to enforce the escrow provisions of contract III. However, as was stated in *Loose v. United States*, 74 F.2d 147, 150 (8th Cir. 1934):

the strongest reason for holding constructive receipt of income to be within the statute is that for taxation purposes income is received or realized when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession. So viewed, it makes no difference why the taxpayer did not reduce to actual possession. The matter is in no wise dependent upon what he does or upon what he fails to do. It depends solely upon the existence of a situation where the income is fully available to him. * * *

We conclude that Charles' power to assert control over the Perry asset proceeds through the escrow provisions of contract III gave Charles sufficient control over the proceeds to result in his constructive receipt of those proceeds during 1973.

Petitioners contend that Charles and Steven entered into an oral agreement, immediately before signing contract III, whereby the escrow agreement never became a part of contract III. The testimony on this point is unconvincing. Firstly, Charles and Steven did not communicate this purported agreement to any of the other parties attending the meeting at which contract III was signed. Secondly, as an experienced businessman, Charles must have understood the importance of having a written contract reflect the actual agreement of the parties. In light of Steven's educational background and the care he took in negotiating the terms of the contract for the sale to Krasnoff, we believe that he also understood the importance of having a written contract reflect the actual agreement of the parties. Consequently, we conclude that no such oral agreement was entered into. Even if the oral agreement had been made, it seems clear under Georgia law[7] that such prior oral agreements cannot contradict or vary the terms of a written contract.[8] Thus, contract III would be

[7]Contract III specifically provides that it shall be interpreted and construed in accordance with the laws of the State of Georgia.

[8]Ga. Code sec. 38–501 provides that "Parol contemporaneous evidence is inadmissible generally to contradict or vary the terms of a valid written instrument." [We refer to the statute as in effect for the year in issue. As a result of a subsequent recodification, this

enforceable as it is written. *Estate of Craft v. Commissioner*, 68 T.C. 249, 263 (1977), affd. 608 F.2d 240 (5th Cir. 1979).[9]

Petitioners contend that *Pityo v. Commissioner*, 70 T.C. 225 (1978), is authority for the proposition that the use of an escrow account is not fatal to the use of the installment method by petitioners. In *Pityo*, the taxpayer created several trusts for the benefit of members of his family, with a bank as trustee. He then sold stock to three of the trusts receiving long-term installment notes for the selling price. Shortly thereafter, the trustee sold a portion of the stock in the open market and invested the cash proceeds in mutual fund periodic withdrawal programs. Thereafter, regular periodic cash withdrawals were made from the mutual fund plans by the trusts in the amounts needed to make the payments on the installment notes to the taxpayer. This Court held that the taxpayer was entitled to report income from the sale of stock to the trusts on the installment method. *Pityo* did not itself involve any escrow agreement. Petitioners are apparently equating the mutual fund periodic withdrawal programs found in *Pityo* with an escrow account. On this point, we find *Pityo* to be inapposite. In *Pityo*, neither the trust agreements nor the installment notes required the trustee to invest the trust assets in the mutual funds. This decision was discretionary with the trustee, which we found to be an independent party

provision is presently identified as Ga. Code Ann. sec. 24–6–1.] See *American Cyanamid Co. v. Ring*, 248 Ga. 673, 286 S.E.2d 1 (1982), *Vaughn & Co., Ltd. v. Saul*, 143 Ga. App. 74, 237 S.E.2d 622 (1977), and *Pulliam v. Merchants' & Miners' State Bank*, 33 Ga. App. 68, 125 S.E. 509 (1924). Petitioners' counsel have not provided us with any analysis on this important question other than the assertion that the written contract was modified orally. We have not found any exceptions to the general rule stated above that might support petitioners' view.

[9]We have held that if a taxpayer asserts a position that is inconsistent with the terms of a written agreement to which the taxpayer was a party, then the taxpayer must provide "strong proof" that the writing does not reflect the true substance of the agreement. See, e.g., *Ledoux v. Commissioner*, 77 T.C. 293, 308 (1981), affd. 695 F.2d 1320 (11th Cir. 1983). This standard of proof, as well as the related rule set out in *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965), are not appropriately applied where the legal issue presented in the case depends on State law property rights or interests. See *Estate of Craft v. Commissioner*, 68 T.C. 249 (1977), affd. 608 F.2d 240 (5th Cir. 1979). But see *Deshotels v. United States*, 450 F.2d 961, 966–967 (5th Cir. 1971). In the instant case, our determination depends, in part, on Charles' legal right to enforce the escrow provisions of contract III. To determine this right, we must interpret contract III in the same manner as would a State court in Georgia. As a result, we have applied the Georgia parol evidence rule. We note that, in the instant case, petitioners have also failed to satisfy the "strong proof" standard.

acting pursuant to its fiduciary duties to the trust beneficiaries. The trustee could have withdrawn the funds from the mutual funds at any time, without the taxpayer's consent, and whether or not the installment notes had been paid off. This situation is in clear contrast to the present case where the creation and maintenance of the escrow account is required by the installment sales contract. In addition, in *Pityo*, the cash withdrawn .from the mutual funds was paid to the trustee which then made the installment payments to the taxpayer. Thus, in *Pityo* the taxpayer did not look to the mutual funds for payment on the notes, but rather expected to collect from the trusts. In this case, the escrow agreement provides for payments directly from the escrow account to Charles.

Under the option and the trust agreement, Steven was required to transfer the proceeds derived from the resale of the Netherlands partnership assets to the trust. However, these proceeds were not transferred to the trust, and there is no evidence that Valerie attempted to enforce the trust agreement. Respondent argues that because Charles could change the trustee of the trust, the trust agreement gave him sufficient power over the trust assets to violate the *Rushing* control test. We disagree. If the trust had been funded, the trustee, whether it were Steven or some other person appointed by Charles, would be subject to the responsibilities and duties of a fiduciary. Absent evidence of some abuse or its likelihood of occurring, we will not assume that these fiduciary duties would be violated in the instant case. As we stated in *Goodman v. Commissioner*, 74 T.C. 684, 708–709 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981), "we conclude that the fact that a seller of property is the trustee of the trusts to which the property is sold, standing alone, does not cause the sale to lack substance or bona fides, or the seller to constructively receive the income from the sale received by the trusts." Similarly, the mere fact that Charles could appoint the trustee of the trust, does not result in a violation of the *Rushing* control test.

In summary, we hold that the three sales by petitioners to Steven were bona fide transactions, and that Charles did not receive the liquidating distribution from Perry. Further, we hold that petitioners were entitled to report the sales of their respective interests in the Netherlands partnership using the

installment method. With respect to the sale of the Perry stock, we hold that Charles constructively received during 1973 an amount equal to the proceeds of Steven's resale of the Netherlands I and Netherlands II Apartments and the underlying land. If, as a result of this constructive receipt, petitioners received more than 30 percent of the selling price of the Perry stock during 1973, then petitioners cannot use the installment method for this sale. If the amounts received in 1973 still do not exceed 30 percent of the selling price, then this constructive receipt will increase the gain properly reportable by petitioners during 1973.

To reflect the conclusion reached herein,

*Decision will be entered under Rule 155.*[10]

---

[10]As part of the Rule 155 computation, the parties are to allocate Steven's proceeds between (1) the Netherlands I and Netherlands II Apartments and the underlying land, which Steven received from Perry, and (2) the Netherlands III Apartments and the leasehold interest in the underlying land, which Steven received through the Netherlands partnership.